Before we proceed, I'd just like to let all the parties know that Justice Holdridge will be participating fully in the decision. He has, of course, seen the briefs and prepared and will be listening to the case, but he is not able to be with us today, but will fully participate and will be part of the decision. Mr. Abate? May it please the court, counsel. On page A4 in the appendix to our initial brief, there is an order that was entered July 1, 2013 by Judge Brandt, which was not on its own a final and appealable order. It enforced a settlement agreement that Judge Brandt found to exist. You'll notice, if you read A4, that in this order, Judge Brandt ordered that there would be a release of liability vis-a-vis C&A Insurance Company in this order. Subsequent to this, or preceding this, what had happened is that there was a document tendered by my opponent in the action below, in the C.H. case, whereby starting on page A9 of our initial brief, Mr. Jones saying that he had a draft settlement agreement attached, and that he thought that it used the bullet points that had been in my correspondence, which is at A6, where in A6, I said C&A would have to pay $60,000 to the Gantos Law Firm. That was in point number 7, which is at A7, that C&A Insurance would be paying this money to the Gantos Law Firm. And when my opponent transmitted the document in response to this that he claimed paralleled the bullet points, he did have the release in there of C&A, but contended that there should be no payment by C&A Insurance because C&A was a stranger to the proceeding. Now this is, I will have to say, that out of the many times that I have seen insurance companies pay money as part of a settlement, almost in every settlement I've ever seen an insurance company pays money, that for the first time I am seeing the notion that if you put in a settlement agreement that an insurance company will pay some money to someone, that that doesn't bind the settlement because the insurance company is not a party to the proceeding. And I think that's what their contention is here. So it was perfectly fine, they say, for Judge Brandt to agree with the defense that there would be no money paid by the insurance company, even though he says on A4 that the insurance company would get a release, that C&A Insurance would get a release. It's our contention in this case that this is something that should be governed by the very contract principles that we learned in our first years in law school about a mirror image that an offer has to be met by an acceptance and if it doesn't get met by that kind of an acceptance, a purported acceptance is actually a counteroffer. It's our view that I made an offer on Exhibit D, A6 to our brief. It's our view that, starting on page A9, that that is a counteroffer because it does not match the offer that we made. Now on A7 and A8, we had signature lines on the offer that we made. They didn't send that back with signature lines signed. Rather, they prepared their own document that had signature lines on it and eliminated the payment by the insurance company of the money that we had specified in our Item 7. Besides that being the largest thing that it did that was different than the offer that was made, but also there were other things about it that were different. As to the other family members, my client is the mother of four children and she was the plaintiff in this case suing one of her children, but there were other lawsuits between the children and so on. And we had said that in our proposal that there should be mutual releases. Well, in the document that we got back, there were some mutual releases, but they weren't all mutual. Some of the brothers were to release the brother who she was suing, but he wasn't going to release them. So there were some non-mutual releases. There was a non-disparagement clause in the document that we got back in response to our proposal, and in that non-disparagement clause, it was one-sided. It was that the defendant, Leo Gantos's sister and two brothers, couldn't disparage him, but nothing about them not being able to be disparaged by him. No prohibition of that. And there had been no talk in our proposal about any kind of non-disparagement clause. There was a confidentiality clause in the document we got back. It's pretty much just boilerplate additional language that becomes incorporated in every settlement, correct? Well, to some extent, but usually I would think that where you've got this sort of multiplicity of litigation going on, when you say mutual releases, that it means that. And where you completely make things one-sided, I don't think that's boilerplate anymore. I think that's something that doesn't match. With respect to the confidentiality clause in paragraph 8, do you oppose the language in that clause? Yes, we did. And so we then, after we got that settlement document in from them, we prepared a document that we thought cleaned everything up in the way of the mutual releases and different things like that, that actually matched the bullet points that we had on some of those things, and then which, on the things that we hadn't mentioned, at least made them mutual and everything. And that is then the agreement, the one that we had proposed, that Judge Brandt then said in the order dated September 24th. It's Exhibit G. Exhibit G, yes. Page A5 of our brief. And so was that sort of, I would call it much more mutual anyway, and much more acceptable language of the usual kind of language that we had cleaned up. But that's not what was tendered back in exchange for our document that we had originally proposed. I mean, this was still things that were being negotiated, only this time in our draft that had these, I'll call it a cleanup in it, we proposed this time that instead of the money going to the Gantos Law Firm, that the money would go to the estate to pay for the estate's attorney's fees. And again, we were willing to give, at this point, CNA Insurance a release, they would be part of the release, but they wouldn't get a free ride like they were going to get in the proposed release that came back at us, where they get released and they don't pay anything. So I think that the right way to look at our draft, then, was a counteroffer to their counteroffer to our original document. And then they sort of countered, I guess, by saying, we accept everything that you've got at that point, the mutual releases and all that, but we don't agree with what you're saying about CNA Insurance having to pay money again. We don't care if it's $160,000 or $60,000, we don't care if it's being paid to the Gantos Law Firm or it's being paid to the estate, we're not going to be having CNA Insurance be paying any money for this settlement that they're getting released in. And so I think it does go back to original law school principles of where you would take a final exam and there would be one document that would propose something, another document would come back, that's a counteroffer, then another document comes back at that, that's another counteroffer, and then another document comes back at that, and that's another counteroffer. I think there's a series of counteroffers after our offer in this thing. And I think that it's important that you apply ordinary contract principles to a settlement negotiation and document as we have here. They are regular contracts. There may be some feeling, I guess, that there could be some gap fillers, but I would hope, for example, that unless a party agrees to some kind of a prior restraint, like a confidentiality provision, there's no doubt you can agree to a confidentiality provision and that it's not a prior restraint for a court to impose one if you do agree to it, but I don't think a court can impose a confidentiality provision just on its own. That would be a problem. And the same thing with a prior restraint, if you will, of a non-disparagement clause, that if you had, like they had, well, they can't disparage Leo, but we won't put anything in there about Leo disparaging them. The judge ordering everybody to sign the Exhibit G solves that problem. Because, well, if Exhibit G had been adopted in its entirety, yes, because we were agreeable to having Exhibit G be entered if it had been entered in its entirety but not to be excised. So in Exhibit G, I think that if it had been an accepted offer, that that would not have been a court-imposed prior restraint anymore. It would have been an agreed-to prior restraint, which is quite different. But that's not the kind of state action I think that is a problem. I apologize, but I'm having trouble understanding your argument, and I do want to understand it. When I look at A7 of the appendix, record page C302, your paragraph 7 is what you discussed here with us. CNA insurance companies shall pay all attorney's fees unpaid to the law firm and attorney's fees of $75,000 to the campus law firm. How does that differ from what is actually in A16 that says the parties basically are responsible for their own attorney's fees? How does it differ? Because my client, who was the mother of Leo Gantos, wanted the insurance company to pay money to her son's law firm as part of the settlement in order to get a release of the insurance company. And I can't really tell you why she wanted that, but I think that that was her right to have me put into the settlement agreement in our proposal, and that there's no requirement that in this document that that money be paid to his law firm. If it's not paid to his law firm, then I don't think she can very well tell herself that she got money paid to her son. I don't think she can very well tell herself, oh, it's okay now for me to pay my other kids the same amount of money that I got paid to him by his insurance company. Whatever her reasons are, I don't think that that is something that's impermissible, if you will, to put into a settlement document that an insurance company would pay money to somebody, especially where the insurance company is going to get released. So whatever her reasons were to require that the insurance company pay her son's law firm money, I don't think that that was improper. And so to say that everybody's going to pay their own attorney's fees, that's to say that Leo will pay his own law firm money, that's quite different than saying that an insurance company will pay his law firm money. Who did C&A Insurance Company represent? They only represented him in the CH case. The Gantos law firm represented him in the 3L cases and in the citation proceeding in the probate. I'm not sure I understand, but I'm going to listen to the arguments again. I'm just saying that they had the opportunity to accept the proposal that was made where she proposed that C&A would pay money to her son's law firm. Which just means both sides are going to pay their own attorney's fees. No, I don't agree with that. I think that when you're saying that the sides will pay, I think that that, for example, would say that if the Gantos law firms owed money, that Leo Gantos, who's the side, he's the party, that he'll pay the money to his own law firm rather than it coming from an insurance company pocket. So I do see that as different. Now, maybe as to her own pocket, that does not make a difference, if that's what you're saying. I'm trying to say that. Well, if that's what you're saying, that in her own pocketbook it does not make a difference whether her son pays his own law firm or whether an insurance company pays his own law firm. But she wanted it in there that the insurance company would pay her son's law firm the money, not that he would have to pay. So that's the way we wrote it up. Now, you know, in law, you could say sometimes that a peppercorn is enough consideration for something. I do believe that in nearly every other settlement that I've ever seen, an insurance company pays some money for getting a release of the insurance company. And I just can't see the reason in this case for any argument, well, the insurance company is not a party. They're never a party to liability cases. We're not a direct action state like Wisconsin is. You can't sue the insurance company directly. So they're always paying, and we're always settling cases by saying, insurance company, you pay the plaintiff. Insurance company, you pay this hospital. Insurance company, you pay this or you pay that. And this is no different, a clause. This is insurance company, you pay this law firm money. Thank you. I think that, you know, she was entitled to put in there what she did. And also, it wasn't the only thing. We thought it was the biggest thing. But it wasn't the only thing that differed between our offer and their purported acceptance. I would say their purported acceptance was a counteroffer. It's the only bullet point that deviated. But the other additional clauses that you're arguing added terms and conditions or removed terms and conditions regarding confidentiality and the non-disparagement, those were added, I think. Tell me why I'm wrong, because I don't see that in your bullet points. Well, there was, for example, in point number two, on A6 there, there was that Leo and Elsa would release each other, but then that the other children would also release him, and that mutual releases would be required to protect Leo. Well, the releases that they drafted were not mutual. They were not mutual. The confidentiality was added. The non-disparagement was added. I take your point. Your point on paragraph two as well. But I'm willing to say that if somebody adds something, I think that makes it a counteroffer as well. Thank you. Ms. Jansen? Ms. Jansen? Please support, also. Kim Jansen, I'm here today on behalf of the defendants at Belize, Leo Gantos and Haymeadow Investments, LLC. I want to start with jurisdiction, because obviously if we don't have that covered, there's not much more that you can do here. And I do want to start with the issue of the July 1st order, because I know there was some confusion in the briefs. This will be one of those rare occasions where I will say on the record that I'm not entirely sure that I'm correct, but I'm also not entirely sure that I'm wrong. It appeared to me in looking at the record that that order was not entered in this case. But it did bear this case number. And that was confusing to me, because it bore the probate case number and then relating to cases including this one. And it was attached to a motion to reconsider. That was how it appeared to me. So it is in this record. It is in the record, yes. It's just not clear to me that an order entered in this case. I'm not sure that's your strongest argument. Sure. But because there were jurisdictional concerns related to it, I felt like it was important to bring that to the Court of Attention, that it wasn't entirely clear. Can you address the issue of didn't the settlement agreement resolve four or five lawsuits?  And that, I do believe, is, in fact, my strongest argument here. And so this order has not been attacked in any other case? That is correct. That is correct. The September 24th order, the one that denies the motion to reconsider and requires the parties to execute that Exhibit G version of the settlement and releases, was entered in all five of the cases, this case, the probate case, and in the three non-probate cases that Mr. Gantos had filed against his siblings, Elza and Ibrahim. It's the exact same motion. Or the exact same order, I mean. Entered in all of those cases. In the cases against Elza and Ibrahim, the non-probate cases, those orders were final. The order dismissed those cases with prejudice. Time to appeal ran and has now since lapsed. Which leaves this case moved. But the plaintiff is not a party to all of those cases, is she? Well, she is for purposes of that order, yes. That order was entered for one reason and one reason alone in all five of those cases. Because she filed her motion to reconsider in all five of those cases. With all five captions. She filed that motion to reconsider with respect to the settlement agreements in all five cases. The order was then entered in all five cases. I cited in my brief the cases of People v. Marker and Ad Acts v. Chicago, that talk about this idea where, even though there hasn't been a formal order of consolidation entered by the court, in a case like this where all of the parties are treating the cases as if they're consolidated, filing the motions and the responses with all of the captions of multiple cases, and the order's entered then. By the same judge. By the same judge. In all of the cases. And in this case, the exact same order. It's not just five similar orders. It's this one order. The court in People v. Marker and citing to Ad Acts v. Chicago, indicated that particularly where the party themselves has filed the motions with all the cases listed in the caption, that has stopped from denying that these cases have been consolidated. And so for these purposes, yes. Plaintiff sued Gantos was in fact a party to that order. And with respect to movements, I'm not even sure that that would matter. Because the fact of the matter is, this identical order in those other cases cannot be reversed. This court can't step outside of this case to affect any change, any modification of the order that is now final in those three other cases. So even if this court were to agree with everything that plaintiff has argued, even if this court were to say, sure, but the trial court got it wrong and wanted to reverse that order, nothing would happen because the same order would remain effective in three other cases. What principle do you think applies? Do you think it's race judicata or collateralism? I think actually three separate principles. First, just straight up mootness. The general principle that if it's impossible to affect relief, then the case is moot. And plaintiff did not respond to that argument in their brief. So I think they've waived any argument that this case is not moot. Then I do think it is collateral estoppel because it's a final judgment. Identical issue, again, no dispute there. The only case in which the order is not final is in the probate case. And we don't dispute that either. No dispute that it's an identical issue in all four of the final cases. No dispute that the issue was actually and necessarily litigated. And the only thing that plaintiff challenges is this idea that they were not a party or in privity with a party in the other four cases. But as I said, this order is entered in those other four cases on plaintiff's motion. But isn't that the first principle of marker is that there have to be parties to all the cases? It said that they didn't say there was no jurisdiction in the felony case of murder, but they rather said you can't appeal that traffic case now because you only filed the appeal in the felony case even though you were the defendant in both the cases. I mean, isn't that a little different from what we have here? It is slightly different. In that case, it was in fact the same party in both of the cases. But I think this happens all the time when you've got global settlements that courts will consolidate the cases in order to effectuate a global settlement. That's what happened here. Plaintiff filed the motion to reconsider in all five of the cases. She didn't need to do that. If she believed that she wasn't a party to those other cases, that this wasn't consolidated, that the proceedings in all of those cases weren't consolidated with respect to this issue, then she would have had no need to file her motion to reconsider in all of those cases. But she chose to do so. She chose to file it in those cases. She's effectively conceded that she was a party because, again, how do you file a motion to reconsider in those cases if you're not a party? And it's significant that none of the other family members, Elza, Ibrahim, who are involved in this settlement agreement, they didn't oppose the settlement agreement. There's no motion, no response from them in this record, indicating that they had any opposition to the motion. So the only reason it's an issue in those other cases is because of plaintiff's resistance and plaintiff's motion to reconsider. And, of course, by not appealing the order in those other cases, plaintiff has released the error that she is claiming. And that's the third principle, in addition to mootness and collateral estoppel, that I think applies to bar this present appeal. As the courts have held, the existence of the distinct disadvantage to the opposing party is the key factor in deciding whether this doctrine applies. And, obviously, the disadvantage to Mr. Gantes, to Leo, is palpable. His lawsuits that he brought as a plaintiff have been dismissed with prejudice. He can't revive them, no matter what this court decides in this appeal. The dismissal of those claims, as to Leo, is irreversible. And, obviously, that's going to be a distinct disadvantage to him if this appeal were to go forward and if plaintiff were to prevail. Now, plaintiff has argued in her brief that, well, she didn't get any benefit out of the dismissal of those other cases. So this doctrine shouldn't apply. It only applies if you've enjoyed the benefits. But it's significant to note, if you look at that April 8th letter, which begins, we are sending this on behalf of our client, Sue Gantos. She asks for this consideration. She asks, as part of her proposed settlement agreement, for the dismissal of these other lawsuits. Clearly, she felt that there was some value to her in seeing these lawsuits dismissed. As counsel suggested as well, trying to assess the value that a mother sees in what she's trying to do for her children, it seems completely plausible to me that she saw a value in trying to bring a resolution to litigation between her children. I don't think it's for this court to second-guess whether there was enough value to her or not in asking for that consideration. It is consideration she asks. It's a benefit that she's enjoying by virtue of the dismissal with prejudice of those other cases. And it leaves Leo Gantos at a distinct disadvantage, because he's given up everything. And now she's asking to take her part of it back. So if there are no other questions on that aspect of the case, I'll go ahead and move into the issues on the merits. There is some initial debate in terms of whether or not, with respect to the finding that a settlement exists, whether this court should apply the manifest weight standard or the de novo standard. I would respectfully argue that this court has always, in deciding whether a settlement agreement has been reached, applied the manifest weight standard. The counsel cites a First District case suggesting that a de novo standard should apply because this is just like summary judgment, where it's decided on papers. And as I explained in my brief, I think that that reasoning falls a little bit short, because when the trial court is looking at summary judgment, they're not looking to decide factual questions, but only to determine whether they exist. And that is a question of law, and that is within the normal realm of issues that this court addresses. When the court is looking at an issue based on documents, not live testimony, but looking at it to decide a factual issue, that's where the manifest weight standard traditionally applies. Deciding a question of fact, which is not one of the areas that this court traditionally ventures into. So I respectfully disagree with the First District's analysis and suggest that this court should adhere to the Third District's standard of manifest weight. With respect to whether there was a settlement agreement, I think we're all in agreement that as far as the bullet points in that April 8 letter, there's one bullet point that's missing, and that's that provision that CNA will pay attorney's fees to Mr. Gantos' attorneys. As the court noted, it's hard to understand how such a provision would even be enforceable, even if it had been included in the exhibit that Mr. Gantos returned. CNA is not a party to this case. Mr. Gantos cannot agree on behalf of CNA, particularly cannot agree on behalf of CNA that CNA would be required to pay money to his law firm. I just don't see how that could possibly be treated as valid consideration in a settlement agreement. Now counsel cites the sort of mirror image rule that applies in traditional contract analysis. In traditional contract cases, that is indeed the rule. This court has adhered to it in the Femming case. But in the case of settlement agreements, and we cite it to Stone v. McCarthy, that standard's relaxed a little bit. The court seeks to facilitate settlements, particularly in a case like this where we've got this broad sort of multifaceted family dispute. Illinois has a policy of encouraging settlement of such disputes. So what the court really looks at is whether the parties reached an agreement on the terms. And I think it's weird that the parties, the only distinction between the terms in the Exhibit E settlement agreement and the bullet points of that April 8th letter is that paragraph 7. And that just cannot be considered a material term because it's not a term that could be enforced against any of these parties. Well, the non-disparaging remarks was made neutral in G v. E. Right, correct. And that portion, as Your Honor referred to it, sort of the boilerplate additional things that go into any settlement agreement. Yeah, I think I would suggest that you look at Exhibit E or Exhibit G sort of in two parts. First, you've got that paragraph of consideration, and it lists the eight or nine bullet points that are drawn from the April 8th letter and inserted therein. That to me is the settlement terms. Now, if you note in the April 8th letter in that second paragraph, and the Counsel has referred to it as well, there's a requirement as part of the settlement proposal that Leo will execute full and complete releases and that there will be mutual releases between the parties. So that additional language is not so much a projection or a modification of the settlement proposal, but it's an attempt to perform the settlement agreement. Okay, we agree. Here we've listed as consideration all the points that you've proposed for settlement. One of the points included that there will be mutual releases, so now we're including all this proposed additional mutual release language. I don't know that there's any need to debate whether or not Exhibit E was mutual, because at this point that's been replaced by Exhibit G, which, as you've noted, solves that problem of mutuality. Drafted by plaintiff herself and by her counsel, they've invited the adoption of that particular language for the releases. So I don't really know how you argue that it was improper to compel the parties to execute this release language that you've drafted yourself. Now I understand that counsel's objection there is that in adopting Exhibit G, the court did strike that additional language about payment of $160,000 in attorney's fees. But counsel acknowledged in his motion to reconsider when he presented that that this was a new item of consideration. This was not something that was contemplated in the parties' settlement agreement. This was attempting to modify the settlement, not modify the release language. So I think that the court correctly adhered to his ruling that there was a valid settlement agreement breach. Those bullet points that are then echoed in the settlement release form, that's the settlement agreement. I think he correctly ruled that, okay, well, let's go with Exhibit G. Parties agree on that. Parties have mutually agreed that this is more suitable release language to include in enforcement of the settlement. And I think that conclusion was completely appropriate and correct. Thank you. With respect to the denial of the motion to reconsider, I don't know that there's a lot that needs to be said. In addition to challenging the July 1st order enforcing the settlement, counsel has also challenged the court's denial of the motion to reconsider that order. Everybody agrees that the standard of review on that is abuse of discretion and that the criteria for granting a motion to reconsider are whether there are new facts, new law, or an error in the application of law. We know there are no new facts. We know there's no new law. And as far as any error in application of the law, the motion to reconsider didn't cite any law. So it's hard to say that they preserved an argument that their motion to reconsider adequately demonstrated an error in the application of law. So I don't think that the trial court abused any discretion in denying that motion to reconsider. With respect to the argument that the trial court erred in requiring the parties to sign Exhibit E, again, I think that's moot because the court has required the parties to now sign Exhibit G. And I think counsel seemed to have some concern in his briefs that perhaps the requirement to execute Exhibit E remained in effect. I don't think that's the case. We will concede that it's Exhibit G that needs to be executed, not Exhibit E. And with respect, finally, to the free speech, prior restraint arguments, respectfully, those arguments were not raised below. That was not argued. It certainly was not argued in response to the motion to enforce settlement. Counsel points to a sort of oblique, vague sentence suggesting that there's a prior restraint and that, therefore, this referred to, implied some sort of First Amendment argument or free speech argument. And to preserve an error for this court's review, you need to do a little bit more than that. You can't just hint at it. It's not a matter of just giving notice of the argument. And there's no developed argument in the court below of any sort of free speech argument. So I believe that argument is waived. Unless the court has any further questions. I would simply ask that you affirm. Thank you. Thank you, Ms. Jansen. Mr. O'Day for reply. Although the order says that it denies our motion to rehear, in fact, the order grants, at least in part, de facto our motion for rehearing because it says we'll have you execute G instead of E, and thereby, I think, acknowledging our points with respect to the non-monetary items, such as the non-mutual releases and the disparagement and all of that, that we were right about that, that that was something that differed from our offer in addition to the money that was to be paid by the insurance company to the Gantos law firm. I would like to say that we were not in favor of either of these two orders. I don't think that we fall within the marker case where the parties to actions kept doing agreed orders and everything that had a consolidated caption in it. We did not agree to any such order ever being entered, and in the marker case, there was a whole history of the parties agreeing to this sort of de facto consolidation, and that's certainly not something that we have here because we weren't the ones who filed a motion to enforce a settlement agreement, et cetera. But you did write that April letter. Yes, we did. Initiating a settlement of all five cases. Yes, we did. Yes, we did. But I don't think that I have a problem with this sort of de facto stuff anyway because in the Supreme Court rules, the 300 sections, I think those are what confers jurisdiction on appellate courts to begin with and that parties by my letter, I don't think I can confer jurisdiction on the appellate court, and I don't think that Judge Brandt can confer jurisdiction on the appellate court on some kind of an assumed consolidation basis. Yes, I don't... Maybe this isn't a good way to put it, but I can't think of a better way. I don't think anybody is saying that it wasn't a sincere letter or that there was some fraud on Mrs. Gantos' part to get a settlement of those four other cases and then back out of this one. I'm trying to address it. There really is some sort of detrimental reliance on that letter that was sent, and you agree the other four cases have gone away. Well, no, I don't agree to that. I think for that proposition, they cited this, I'll pronounce it like a liquor, the tequila case, T-E-K-E-L-A, and in that case, there was an adoption case that couldn't be reopened because the Adoption Act provides that you have to do that within a year or two. Here, we're still within the two years of 214.01 of the Code of Civil Procedure, and so I'm not sure that the tequila case applies, which was a one-year adoption case. So you think the dismissals could blow up? Well, I think they could file a 214.01, depending on your ruling, under the tequila case. The tequila case said, well, we're going to say that you've taken advantage of the situation because you can't file anything now. The year has gone under the Adoption Act, or the other side can't file anything, but that Adoption Act doesn't apply to us. Section 214.01, which is a two-year invite to vacate judgments, applies here, and I would think that they would cite the tequila case in that vein. The fact is that you can debate also what's pro-settlement and what's not pro-settlement. Here, we are trying to say that there is no settlement. That is true. Depending on what the ruling is in this case, if you cannot provide that an insurance company is going to pay money and have that stick in a settlement proposal, even where the insurance company is going to get released as part of the deal, and where they're paying for the defense of the CH case, albeit not the other cases, then who can even write a settlement offer at this point in Illinois where you don't have, for example, the insurance company's signature on it somehow? We never get the insurance company's signatures on these settlements. Rather, we do it through the lawyers that the insurance companies hire to represent their insurers. And that lawyer then, although he or she is beholden to represent the interests of the insured, they also have a connection to the insurance company to deal with the insurance company to get whatever it is that the consideration is supposed to be. So, in a way, I look at this as anti-settlement, what happened here, if it comes down as a decision that you can't put something in there in your settlement about an insurance company paying money. Then, with regard to the Stone case. In the Stone case, there was a change in the agreement that something was to happen in 90 days rather than in 60 days. That was the change that they were relying on to say that there was not a mirror image settlement. But I believe the closing had taken place already on the real estate within 60 days, so it really didn't matter whether it said 60 or 90. And so that case did hold that the change from 60 to 90 was, in fact, not a change at all because the closing occurred within 60 days anyway. And I think that's entirely distinguishable because a lot of the things that were supposed to be signed off on here weren't signed off on. Instead, we got the counteroffer from the other side. So, I want to emphasize, I do not, even though the order says that our motion to rehear was denied, in fact, there was a big change in the order when he ordered G to be signed instead of E, and I think that's a little bit of a granting almost of our motion to rehear. It just wasn't granted in its entirety, but it does go to show, I think, that there was not a mirror image and it was a counteroffer rather than an acceptance of our proposal when they sent their document. Thank you. Thank you, Mr. O'Day, and thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued in a short time frame. And right now, we'll take a short break for our panel.